In re The **DREXEL BURNHAM LAMBERT GROUP, INC., et al., Debtors.**

**FLORIDA DEPARTMENT OF INSUR-ANCE, as Receiver of the Estate of Guaranty Security Life Insurance Company, Appellant,**

v.

The **DREXEL BURNHAM LAMBERT GROUP INC., et al., Appellees.**

Nos. 90 B 10421 (FGC), 92 Civ. 7932 (MP) and 90 Civ. 6954 (MP).

United States District Court, S.D. New York.

Jan. 4, 1993.

See also 148 B.R. 993.

Tew & Garcia–Pedrosa (Thomas Tew, Michael Goldberg, of counsel), Miami, FL, for appellant.

Weil, Gotshal & Manges (Peter Gruenberger, of counsel), New York City, for appellee DBL Liquidating Trust.

Berger & Montague, P.C. (David Berger, of counsel), Philadelphia, PA, Wolf Popper Ross Wolf & Jones (Stanley Nemser, of counsel), New York City, for appellee Subclass B.

MILTON POLLACK, Senior District Judge:

GSL was a Florida insurance company which, during a period beginning in January 1984 and ending sometime before August 1991—when GSL was declared insolvent and placed into receivership—, marketed and sold above-market yielding annuities and single premium whole life insurance policies through highly commissioned agents and brokers. GSL supported its high costs and above market yields by investing a very large portion of its acquired premiums in junk bonds purchased from, or through, Drexel.

On February 13, 1990, Drexel filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, and in June 1990 the Bankruptcy Court fixed November 15, 1990, as the Bar Date for filing claims against the Drexel Estate. More than 15,000 claims were timely filed.

On August 12, 1991, a Florida state court, on petition by the Department, declared GSL insolvent, ordered it be placed into rehabilitation proceedings under Flori-

da state law, and appointed the Department as Receiver over the defunct GSL.[1]

On March 4, 1992, almost seven months after appellant was appointed Receiver, more than 15 months after the Bar Date, more than nine months after the major creditors had entered into a major settlement of all their claims which included the fixed creditors, the contingent creditors, the equity holders and the Debtors, eight months after the settlement with Internal Revenue Service for all tax periods ending January 1, 1991, after 161,000 notices had been sent all over the country of the Claims Settlement Agreement and a hearing held which approved the same; six months after Drexel filed its initial Plan of Reorganization for distribution of assets; after a global settlement was reached with the major figures in the Drexel organization for the contribution of $1.3 billion to the Drexel reorganization, seven months after the Debtors' Amended Disclosure Statement and contemporaneously with the confirmation of the Debtors' Second Amended Plan of Reorganization, the Department as Receiver submitted to the Drexel Estate, without any authority therefor, attempting to inject into the pending proceedings a one sentence conclusory document purporting to assert a $175 million claim for violation of federal securities laws [from 1984–1988] in relation to GSL's junk bond investments purchased from Drexel.

The Plan of Reorganization was heard on wide-spread notice and publicity and approved on March 6, 1992, and was consummated on April 30, 1992, at which time distribution of cash dividends payable to creditors commenced. Over $800 million was distributed on April 30 and another $100 million approximately was distributed on account in the next two months from Drexel's assets. Distributions in accordance with the confirmed approved Plan are ongoing.

---

**1.** On May 16, 1991, the Department had entered into an Order for Administrative Supervision of GSL (the "Stipulation") with GSL's consent. Appellees thus assert, and the Department does not deny, that the Department actually gained effective control of GSL even earlier than August 12, 1991.

Upon Drexel's objection and that of others to the document transmitted on behalf of GSL to Drexel on March 4, 1992, and after a further unexplained delay until July 31, 1992, the Appellant made a motion to extend the 1990 Bar Date. The Appellant blandly asserted that the delays of GSL and its Receiver in filing a claim against Drexel were due to "excusable neglect." Its excuse for the omission to file by November 15, 1990, was that the owners of GSL had dominated the company at that time; and that after the Department stepped into GSL's affairs in May, 1991, and then took over as Receiver in August 1991, it took time to discover the improprieties which it now asserts. In fact, this reason was exploded upon a showing that in December 1991 the Receiver had brought suit in the Florida courts against brokers, attorneys and accountants in part on the very claims which it attempted to deliver to Drexel, but nevertheless, did not move to extend the Bar Date to do so until July 31, 1992, by which time the Drexel Plan of Reorganization had already been fully consummated so far as any unasserted claims were concerned.

There was no showing by the Receiver that others in the GSL organization, such as the CEO/CFO, were under any incapacity to file a claim before the Bar Date. It was shown in the record that the CEO/CFO regularly functioned on the accounts and financial reports submitted by GSL's accountants.

Even after the Department came in as Receiver in August 1991, it waited a full year before it sought to extend the Bar Date in order to file the same substantive claims which it had already fully investigated in 1991. A suit had been filed in Jacksonville, Florida against GSL's parent, Transmart in 1989, which was under the Department's supervision and was also controlled by the same owners. A suit was filed in December 1991 by the Department against brokers, attorneys and accountants. Each case asserted the same substantive complaints in part, viz., improper purchases of junk bonds and equity stripping. In March 1992, the Department filed a suit against the Milkens, again asserting junk bonds and equity stripping. Meanwhile, Drexel's complicated bankruptcy proceedings which were not waiting on the Florida Department of Insurance, were being or had been completed and nearly a billion dollars was distributed to Drexel's creditors out of the bankruptcy estate.

On September 17, 1992, a hearing on the Department's motion to extend the Bar Date was conducted before Bankruptcy Judge Conrad. After ordering that the parties' written submissions, including briefs, be made part of the record, and after hearing both sides, Bankruptcy Judge Conrad ruled, from the bench, that the Department had failed to establish that a filing at such a late date was due to excusable neglect. Bankruptcy Judge Conrad further pointed out that the Department's claims were in any event probably barred by the applicable federal securities statute of limitations (one year from the discovery of fraud or not more than three years after the transactions).

## DISCUSSION

On appeal, the Department contends that corrupt officers dominated the company at all relevant times prior to the Bar Date and would have had no incentive to file a claim which would reveal their frauds on GSL and that the Bankruptcy Court erred in giving any weight to the prejudice of Drexel's creditors were the Receiver's claims to be added to the allowed claims of creditors of Drexel.

Bankruptcy Rule 3003(c)(3) provides in pertinent part, that:

> The court shall fix and for cause shown may extend the time within which proofs of claim or interest may be filed.

It is well established, and is not disputed by either party, that the "for cause" language of Rule 3003(c)(3) must be interpreted in accordance with Bankruptcy Rule 9006(b), which provides that:

> [W]hen an act is required ... within a specified period ..., the court for cause shown may at any time *in its discretion* ... (2) on motion made after expiration of the specified period permit the act to

be done *where the failure to act was the result of excusable neglect.*

(Emphasis added.)

■ The Second Circuit applies a three part standard for determining whether a failure to timely file proof of claim was due to excusable neglect: (1) the adequacy of the Notice of the Bar Date provided, (2) the source of the delay, including the sophistication of the creditor, and (3) the prejudice to the bankrupts' estate, should the extension be granted. *See In re L.F. Rothschild Holdings, Inc.,* No. 92 Civ. 1129, 1992 WL 200834, at *5 (S.D.N.Y. August 3, 1992); *In re O.P.M. Leasing Services, Inc.,* 48 B.R. 824, 830–31 (S.D.N.Y.1985); *In re Drexel Burnham Lambert Group, Inc.,* 129 B.R. 22, 25 (Bankr.S.D.N.Y.1991); *In re Nutri*Bevco, Inc.,* 117 B.R. 771, 785 (Bankr. S.D.N.Y.1990); *In re Chateaugay Corp.,* 104 B.R. 617, 619–20 (Bankr.S.D.N.Y.1989); *In re Sasson Jeans, Inc.,* 96 B.R. 457, 460 (Bankr.S.D.N.Y.1989); *In re Waterman S.S. Corp.,* 59 B.R. 724, 728 (Bankr. S.D.N.Y.1986); *In re Horvath,* 20 B.R. 962, 965–66 (Bankr.S.D.N.Y.1982); *Matter of Heyward,* 15 B.R. 629, 636 (Bankr. E.D.N.Y.1981).

■ In applying this standard, courts have held that excusable neglect is found only when a party's failure to timely file is due to "unique or extraordinary" circumstances beyond the reasonable control of the delinquent party. *See In re L.F. Rothschild Holdings, Inc.,* No. 92 Civ. 1129, 1992 WL 200834 at *5 (S.D.N.Y. Aug. 3, 1992); *In re O.P.M. Leasing Services, Inc.,* 48 B.R. 824, 830 (S.D.N.Y.1985); *In re Chateaugay Corp.,* 104 B.R. 617, 619 (Bankr.S.D.N.Y.1989). Furthermore, requests for extensions of time are "strictly

scrutinized" because of the importance of the Bar Date to administration of an Estate and reorganization of the bankrupt. *In re Drexel Burnham Lambert Group, Inc. (Barclays Bank, PLC),* 129 B.R. 22, 24 (Bankr.S.D.N.Y.1991). As Bankruptcy Judge Conrad stated:

> A claims bar date provides a mechanism by which a trustee in bankruptcy can estimate the potential liabilities of the debtor. Accordingly, a request for extension of the bar date should be strictly scrutinized because a fixed and known bar date is essential to the orderly administration and successful reorganization in a Chapter 11 case.

*In re Drexel,* 129 B.R. at 24.

■ The Bankruptcy Court below found that notice of the Bar Date was adequate and that finding appears to be non-exceptionable. Since the determination whether to grant or deny an extension to file a late proof of claim is expressly left to the Bankruptcy Court's discretion, this Court may review the Bankruptcy Court' decision for abuse of discretion only. *See In re Hooker Investments, Inc.,* 122 B.R. 659 (S.D.N.Y. 1991), *appeal denied,* 937 F.2d 833 (2d Cir. 1991) ("this Court will review the actions of the bankruptcy judge under the abuse of discretion standard.")

■ The Department contends that while Sanford and Blackburn (the owners of GSL) indisputedly had adequate notice, such notice should not be imputed to GSL because it was against their interests to act upon such notice. The Department cites cases which found an "adverse interest" exception to the general legal principal that information received by corporate agents are imputed to the corporate principal.[2]

---

**2.** The Department cites, *In re Investors Funding Corp.,* 523 F.Supp. 533, 540–41 (S.D.N.Y.1980); *In re Wedtech Corp.,* 81 B.R. 240, 241–42 (S.D.N.Y.1987). *See also FDIC v. O'Melveny & Meyers,* 969 F.2d 744, 750 (9th Cir.1992) ("the knowledge of a corporate officer within the scope of his employment is knowledge of the corporation, however, the knowledge acquired by the agent who is acting adversely to his principal will not be attributed to the principal"). As the Court in *In re Investors Funding* stated:

The controlling principles under *New York law* are not in dispute. Generally, the knowledge of an agent acquired within the scope of his employment is imputed to the principal. The same rule applies to information received by corporate agents. However, when an agent is acting adversely to the interest of the principal, his knowledge and conduct are not imputed to the principal. This "adverse interest" exception is not triggered, on the other hand, where the agent is also acting for the principal's benefit, even though the agent's

None of these cases, however, involved nullifying notice of a federal statutory bar date received by a corporation.[3] Counsel for the Department conceded on the argument of this appeal that the wide publicity of the junk bond scandal could not have escaped the notice of the Department.

■ The Department contends that GSL was not chargeable with the failure to timely file because it was dominated by adverse controlling officers. No case has been found where an adversely dominated company has used that circumstance as a basis for extending a bankruptcy Bar Date. The Department does not cite any direct legal support for this proposition, but argues that in an analogous situation "[i]t is well settled that the running of the statute of limitations may be suspended by a period of adverse domination of the injured corporation by wrongdoers." *Saylor v. Bastedo*, 100 F.R.D. 44, 50 (S.D.N.Y.1983). *See also Armstrong v. McAlpin*, 699 F.2d 79 (2d Cir.1983); *IIT, An Intern. Inv. Trust v. Cornfeld*, 619 F.2d 909 (2d Cir. 1980). The Department argues that in the instant case, this "adverse domination doctrine" should operate by analogy to permit the extraordinary extension of the Bar Date sought here. As the Department concedes, however, the equitable tolling doctrine has never been applied to extend a Bar Date in a Chapter 11 Bankruptcy.

Furthermore, independent of whether the failure to file prior to November 15, 1990, is excusable within limits, the Bankruptcy Court's determination was that the

Department should nonetheless have acted in August 1991, after it was appointed Receiver, to take the necessary steps to file at least a protective proof of claim, and that its failure to seek permission to file until a year after its appointment was inexcusable neglect. That finding is supported by the record and is adequate grounds in itself for affirmance.[4]

Bankruptcy Judge Conrad stated, in relevant part:

> [Y]ou [the Department] were aware of the insolvency of [GSL] in the spring of 1991 when [the Drexel bankruptcy] was going on and you then actually took over in August of '91.
>
> Granted the bar date passed, you could have filed a very simple protective claim at that time which you did not and then you waited and I think we are getting more to the equitable issues, you waited until after the plan is ready to be confirmed, either a day or two before....

(J.A. 587).

To begin with, the Department does not seriously dispute that it had, or should have had, adequate knowledge of the Drexel bankruptcy proceedings and of the Bar Date.

The Department argues, however, that it took time to fully investigate GSL's claim before it could file an unliquidated claim. The Department's protests are undermined by the fact that it had utilized the charges of improper junk bond purchasing and equity stripping in lawsuits which it filed long before it moved to extend the Bar Date.[5]

---

> primary interest is inimical to that of the principal.
>
> *In re Investors Funding*, 523 F.Supp. at 541 (emphasis added; citations omitted).
>
> In other words, the adverse interest exception applies unless the unfaithful agent's or officer's conduct, while motivated by improper self-serving reasons, also benefit the corporate principal. *In re Investors Funding*, 523 F.Supp. at 541. In the instant case, appellees do not contend that Sanford's and Blackburn's infidelity also benefitted GSL in any way.

**3.** The cases all involved the issue whether knowledge of corporate officers or agents may be imputed to the corporation *for estoppel defense purposes* in suits brought by the corporation.

**4.** The Department transmitted a purported claim in March, 1992, but, clearly, as the Bar Date had passed by then, its transmission, unaccompanied by a motion to extend the Bar Date, was of no avail under Bankruptcy Rule 9006. Inexplicably, it was not until July 31, 1992, that the Department actually filed a motion for an extension of the Bar Date.

**5.** The Department argues that a "primary basis" of its claim is that Drexel was bribing GSL's controlling officers by providing "equity" to them that rightfully belonged to GSL. The Department contends that "had GSL's controlling officers filed a claim, it necessarily would have had to describe the equity stripping, and therefore the bribery."

The Department gives no persuasive rationale for its failure to obtain leave to file a protective proof of claim before conducting its investigations or immediately thereafter.[6]

The record clearly supports the Bankruptcy Court's determination that the Department had adequate knowledge of GSL claims to file proof of claim much earlier than it did. For example, the Department filed suit on GSL's behalf against brokers, attorneys and accountants on December 20, 1991, in which the Department alleged precisely the improper junk bond purchasing and equity stripping of which it argues it did not have information till later. *See State of Florida Department of Insurance, as Receiver of Guarantee Security Life Insurance Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., et al.,* Circuit Court of the Fourth Judicial Circuit, Duval County, Florida, Case No. 91–17911–CA–CV–C. Similar allegations of the junk bond purchases and equity stripping therefrom are made by the Department in a suit it brought on GSL's behalf against Michael and Lowell Milken in March, 1992. *See State of Florida Department of Insurance, as Receiver of Guarantee Security Life Insurance Co. v. Michael R. Milken and Lowell J. Milken,* United States District Court, Middle District of Florida, Case No. 92–243–CIV–J–14. Other facts supporting the Bankruptcy Court's determination that the Department knew or should have known of GSL's claims much earlier than July, 1992, include:

(1) At all times prior to the Bar Date, GSL was owned by Transmark USA, an entity also controlled by Sanford, Blackburn, and their affiliates. In 1989, a complaint was filed in the Jacksonville, Florida branch of the Federal Court against Transmark, Sanford, and Blackburn alleging precisely the improper junk bond purchasing and the kind of equity stripping alleged here;[7]

(2) In 1990, Columbia Savings and Loan Association filed a notorious complaint and timely proof of claim alleging equity stripping by GSL's principals;[8]

(3) Insurance companies operating in Florida were prohibited by statute from investing more than 20% of their assets in junk bonds, but GSL was the beneficiary of a "grandfather" waiver by the Department of the limitation;[9]

(4) The Department as regulator received annual reports from GSL from which it could, and should, have become aware of GSL's large junk bond investments and of its extensive dealings with Drexel; and

(5) It is not disputed that the Drexel bankruptcy and the related law suits and government investigations concerning the high yield "junk bond" extravaganza of Drexel constitute one of the most widely publicized and notorious financial debacles of modern times.

With respect to the third prong of the excusable neglect standard, the Bankruptcy Court's determination that excusing the Department's failure to promptly act for over a critical year period, between August, 1991, and July, 1992, during which much irreversible progress was made towards resolving the Drexel bankruptcy, would result in undue prejudice to the bankruptcy estate is amply supported by the record. The parties agree that the Drexel plan is a liquidating plan. The acceptance of a substantial late claim after consummation of a vigorously negotiated

---

6. The Department does not dispute the appellees' assertion that it had effective control of GSL as early as May 1991, when GSL consented to and entered into an Order for Administrative Supervision of GSL which provided, in part, for the diversion of all premiums received by GSL into an escrow fund supervised by the Department.

7. *See CSL Investments v. Transmark USA, Inc., et al.,* MD.Fla., C.A. No. 89–986–Civ.–J–16. (J.A. 200–33).

8. *See Columbia Savings and Loan Assoc. v. Michael Milken, et al.,* C.D.Cal., C.A. No. 90–6656 RSWL (KX). (J.A. 235–50). See also proof of claim of Columbia Savings and Loan Assoc., filed November 14, 1990. (J.A. 252–261).

9. This was conceded by Appellant's counsel on the argument and mention thereof also appeared in a Wall Street Journal article. (J.A. 7.16–27)

claims settlement and Plan of Reorganization thereon and a distribution of a major part of the assets thereunder, would disrupt the economic model on which the creditors, the Debtor and the stockholders had reached their agreements. In this regard Bankruptcy Judge Conrad stated:

> [T]he distribution is one of the largest distributions in a bankruptcy case and [the late filing] does impact severely on all the creditors, whether you are in subclass B or you are going to be other creditors.
>
> Granted there is a reserve here, but I think that one of your arguments that the creditors knew about the impact, I can assure you from working on this case that the creditors probably knew within probably half a cent, if not better, because of the modeling programs that have been involved in this case, what they were going to get even with the reserves....
>
> .    .    .    .    .
>
> [I]f your claim was allowed whether you belong there or in the other class, a $200 million claim even in Drexel is a material claim, and because of the status of this case right at this time, equity would not allow me to do that.

(J.A. 588–89).

The period between August 1991, and July 1992, was a critical period in the Drexel bankruptcy during which the protracted efforts of all of the parties involved in the estate culminated. In August 1991, this court approved a claims settlement agreement which effectively divided up the Drexel estate. This Court's approval of the agreement was affirmed by the Second Circuit on March 27, 1992. Drexel's Plan of Reorganization was approved on March 6, 1992, and it was consummated on April 30, 1992, at which time distribution of cash dividends and other negotiated benefits to

creditors commenced. As of September, 1992, when Judge Conrad heard the Department's motion to extend the Bar Date, $818 million had been distributed. Presently distributions approach $900 million. Appellant's claim of about $200 million would, if recognized now, be about 20% of all remaining claims for which liquidations and payments remain to be processed. The dilutive effect on the remaining unpaid claims of creditors who filed timely is obvious.

The Department does not seriously contend that the creditors would not be harmed by consideration after the consummation of the Plan whether the Department has a cognizable claim and how it fits into the consummated arrangements made heretofore. Rather, it argues that the Bankruptcy Court erred, as a matter of law, in considering this harm in its analysis. The Department contends that under the Second Circuit's three prong test, only harm to the Debtor may be considered.

■ The Department's argument is thinly disguised self-interest in the face of its dilatory conduct. While some courts have held that harm to the debtor's estate is not an appropriate factor in an excusable neglect analysis because rule 9006(b) focuses only on the actions of the delinquent creditor,[10] the plain language of rule 9006(b) is permissive and not compulsive: rule 9006(b) provides that a bankruptcy court *"May ...* in its discretion" extend the bar date if it finds excusable neglect. Rule 9006(b) clearly vests the decision to extend the bar date squarely within the discretion of the Bankruptcy Judge. It is not, therefore, inconsistent with the language of rule 9006(b), and it is clearly the law in the Second Circuit, for a Bankruptcy Judge to inform his discretion with consideration of inconvenience and harm to all those involved in the debtor's estate.[11]

---

10. *See, e.g., In re South Atlantic Financial Corp.,* 767 F.2d 814, 818 (11th Cir.1985), *cert. denied,* 475 U.S. 1015, 106 S.Ct. 1197, 89 L.Ed.2d 311 (1986).

11. *See, e.g., Hanson v. First Bank of South Dakota, N.A.,* 828 F.2d 1310, 1315 (8th Cir.1987) (where a claimant has successfully demonstrat-

ed that its failure to timely file was due to circumstances beyond its control, a court, in the exercise of its discretion, may nevertheless deny an extension because such an extension would prejudice the debtor); *Matter of Dues,* 98 B.R. 434, 438 n. 1 (Bankr.N.D.Ind.1989) ("The issue of prejudice only becomes relevant once the court is satisfied that excusable neglect has been

The harm to the Debtors is apparent—it would require recomputation and recasting of everything which had occurred in reliance on the claims timely filed and which entered into the vigorously negotiated settlements achieved, the promulgation of the Plan of Reorganization and the consents obtained thereto and the distributions of assets already made.

With this understanding of the proper role of the harm-to-the-debtors-estate factor in the excusable neglect analysis, it is apparent that there is no abuse of discretion, or other reversible error, in a bankruptcy court's consideration of harm to creditors, as members of the debtor's estate.

Indeed, in light of the policy rationale that courts have articulated for strictly enforcing a bar date, harm to diligent creditors is a particularly appropriate consideration in deciding a significantly belated motion for an extension. As the bankruptcy court stated in *In re Drexel Burnham Lambert Group, Inc. (Barclays Bank, PLC)*, 129 B.R. 22 (Bankr.S.D.N.Y.1991):

> A claims bar date provides a mechanism by which a trustee in bankruptcy can estimate the potential liabilities of the debtor.
>
> .  .  .  .  .
>
> [A] grant of an extension of time to file a proof of claim will directly prejudice DBL's efforts to reorganize in a timely fashion and will adversely impact upon DBL's creditors. A claim filing bar date plays a critical role in the reorganization process of a Chapter 11 case. The bar date is not imposed simply to benefit the debtor by barring claims due to the passage of time. The bar date is imposed so that the bankruptcy case can be administered. Each creditor is required to file its proof of claim early in the bankruptcy

case so that the trustee, the creditors, and the debtor can negotiate, formulate, and fund a plan of reorganization. Complex and exhaustive negotiations have been taking place. Absent finality, reorganization would be impossible.

*In re Drexel*, 129 B.R. at 24, 26. *See also In re Hooker Investments*, 122 B.R. at 664 ("The setting of a bar date is an important event in Chapter 11 cases. The bar order by forcing creditors to make known their claims against the estate, enables the bankruptcy judge to tally up the debtor's assets and liabilities so that a reorganization plan can be developed."). Thus, it may be said that harm to creditors who have acted in reliance on the certainty of a firm bar date is precisely the reason why an motion to extend the bar date must be strictly scrutinized and may be granted only if excusable neglect is found in "extraordinary circumstances." Bankruptcy Judge Conrad's decision is not an exercise of discretion reversible in this regard.[12]

## SUMMARY AND CONCLUSIONS

One cannot read the record of the argument of the appeal without coming away with a sense that wholly inequitable, as well as an insufficient legal claim is attempted to be asserted by the Appellant.

This case, in its essence, involves a balancing of equities: between the theoretical damage suffered by 56,000 policyholders of GSL who were the unwitting victims of unfaithful corporate officers and the prejudice to numerous creditors of Drexel who laboriously negotiated and then approved a consummated Plan, in justifiable reliance on the finality of a strictly enforced bar date. As Bankruptcy Judge Conrad stated, this case falls somewhere between *In re Drexel Burnham Lambert Group, Inc. (Barclays Bank, Plc.)*, 129 B.R. 22 (Bankr.

---

shown. Prejudice to any of the parties involved then becomes a factor in the court's consideration as to how it should exercise its discretion with respect to the untimely act.").

**12.** The Department argues that the Bankruptcy Court erred in basing its decision in "large part" on its erroneous conclusion that the Department's claim was barred by the statute of limitations under *Lampf, Pleva, Lipkind, Prupis &*

*Petigrow v. Gilbertson*, —— U.S. ——, ——, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991). As we find no reversible error in the Bankruptcy Court's determination that the Department's failure to file was not excusable neglect, we do not reach the issue whether the claims, if allowed to be filed, would be barred by the statute of limitations.

**1010**

S.D.N.Y.1991), in which an extension was denied where actual notice was sent to the creditor bank at its New York, and Australian offices, although not to its London office, which the bank claims is the office responsible for responding to such notices, and *In re Drexel Burnham Lambert Group, Inc.*, 1992 W.L. 53742 (Bankr. S.D.N.Y.1992), in which an extension was granted where an indentured trustee was bound by contractual duty to do nothing at all until there was a trust indenture default, which occurred after the bar date.

The initial responsibility for weighing this balance rests with the sound exercise of discretion of the bankruptcy court, and its decision should not be disturbed on appeal where it is not clearly erroneous and to the contrary is supported by the record. Bankruptcy Judge Conrad's decision was made after careful consideration of the entire record which this Court has reviewed:

> I have really read, I have to confess when I got your papers I struggled very hard to see whether I could get you in there, because I have sympathy for those 56,000 policyholders, but in point of fact there is no way legally that I can let you in.... (J.A. 590)

It was shown on the argument of the appeal that the Department has utilized its position of not having an existing creditors' claim on file against the Drexel Bankruptcy estate as of February 4, 1992, that it was eligible to assert its claim against the Global Class Action Settlement Fund created in the *Presidential Life* case (The "Global Class Action") an outgrowth from the $1.3 billion settlement previously mentioned. This was a worldwide class action filed on behalf of all persons and entities with presently existing but unasserted claims as of February 4, 1992 against Drexel, Milken and other Settling Participants. On March 11, 1992, this class action was settled for $50 million to be funded out of the $1.3 billion upon effectiveness of that settlement and the Global Action Settlement was subsequently Court approved. The Department filed its unliquidated GSL claim against that settlement fund.

Thus, to restate, the Department has asserted its attempted claim against the Drexel bankruptcy estate against the Milken Global Settlement in the *Prudential Life* case. If GSL or the Department had on file at February 4, 1992 a timely filed creditor's claim (the break date for those who had not filed against the bankruptcy), the Department would have been barred from again asserting the same claim which it now has asserted against the settlement fund created in the Prudential case, subject to the liquidation thereof and any defenses applicable thereto.

The ruling refusing an extension of the Bar Date will not be disturbed.

Affirmed.