**In re HILLS STORES COMPANY, et al.**

**Bankruptcy No. 91 B 10488.**

United States Bankruptcy Court,
S.D. New York.

June 9, 1994.

Kaye, Scholer, Fierman, Hays & Handler by Craig Rieders, New York City, for Hills Stores Co.

Stroock & Stroock & Lavan by Alan Halperin, New York City, for American Credit Indem. Co.

Otterbourg, Steindler, Houston & Rosen by Scott Hazan, New York City, for Official Committee of Unsecured Creditors.

## CORRECTED TEXT OF BENCH RULING DELIVERED JANUARY 27, 1994 DENYING MOTION TO DEEM BALLOTS TIMELY RECEIVED

TINA L. BROZMAN, Bankruptcy Judge.

American Credit Indemnity Company ("ACI") has moved to have its ballots, which were received five days after the ballot deadline, deemed timely received, notwithstanding that distribution has commenced under the debtors' confirmed plan of reorganization.

### I.

Commendably, neither party quarrels with the facts giving rise to this motion. On February 4, 1991, Hills Stores Company ("Hills") and its affiliates filed chapter 11 petitions. Hills is a discount retailer, currently operating 151 department stores in 11 states in the eastern and central regions of the United States. The stores offer a broad range of brand name and other first quality general merchandise, including apparel, footwear, home furnishings, jewelry and toys. I confirmed Hill's first amended consolidated plan of reorganization on September 10, 1993. The plan became effective October 4, 1993. The first distribution under the confirmed plan was made on October 17 and 18, 1993. This motion was filed on November 12, 1993.

ACI is an insurance company that specializes in the insurance of ordinary trade receivables. As a result of Hills' chapter 11 filing, some entities insured by ACI filed claims under their credit insurance policies. ACI paid its insureds and took by assignment some $7.9 million in receivables owing from Hills. ACI has played a major role in these chapter 11 cases, serving on Hills' Creditor's Committee as both a member and co-chair.

Hills' plan, which was negotiated with its committee of unsecured creditors, provided that class 6 claimants, like ACI, could elect one of three distribution schemes under the plan: (i) an equity distribution composed of preferred, convertible and common stock, (ii) cash and equity, or (iii) a pro rata distribution composed of cash, notes and stock. Each distribution option was capped at a specified aggregate dollar amount of allowed claims making such election. In the event the aggregate dollar amount of class 6 claims electing to receive a particular class 6 distribution option exceeded this cap, the plan provided that each class 6 claimholder electing that distribution would receive (1) a pro rata share of the oversubscribed class 6 distribution, and (2) a pro rata portion of one or both of the other undersubscribed options. In other words, the plan did not guarantee that a claimant would receive all of the treatment which it elected, for the plan obligated Hills to provide particular treatment up to a specified aggregate amount for all electing creditors. Thus, creditors could receive one portion of their distributions in accordance with their elections and the balance out of a different undersubscribed category.

In early August, 1993, ACI sold $6 million of its claims to two purchasers (the Purchasers). Since the claims were sold after the record date (the date for determining which holders of claims were eligible to vote and make the class 6 election), the Purchasers could not vote and make the class 6 election. As a result, ACI and the Purchasers contractually agreed that ACI would vote the Purchasers' claims in favor of the plan and make the equity election for the Purchasers. ACI, in contrast, wanted the cash/equity distribution for the remaining $1.9 million in claims that it held after the sale. This put ACI in the position of having to bifurcate its vote, returning one class 6 ballot for the Purchasers' claims and one for its remaining claims. On August 12, 1993, some three weeks before

the ballots were due, counsel to Hills agreed to permit ACI to make such a bifurcated election. ACI's ballot for that portion of its claims which it retained bears this date.

The order approving Hills' first amended consolidated disclosure statement, which I signed on July 20, 1993, made clear at pages 3–4 that all properly completed ballots actually received by Hills' balloting agent by 5:00 p.m. on September 2, 1993 (the ballot date), would be counted for voting purposes. Each of the notice of hearing on confirmation, the class 6 ballot and its election subsection, and the disclosure statement also stated plainly that claimholders had to remit their ballots so as to be received by this September 2nd deadline. Indeed, the ballot itself stated in bold, uppercase letters right under the caption that it had to be received by the ballot date. The election subsection emphasized that if the ballot were not returned by September 2, the election would be made by Hills.

On August 30, 1993, eighteen days after its conversation with counsel to Hills, ACI placed its ballots in an internal office "outbox" for certified mailing. The envelope was not postmarked until September 2, 1993, due to what ACI describes as its own "mailroom error." On September 7, 1993, five days after the ballot deadline, Hills' balloting agent received ACI's ballots.

Because ACI's two ballots were not timely received, neither was counted in tabulating the vote on the plan, or more importantly for today's purposes, in determining which creditors had elected particular distribution options. Since the equity distribution scheme was oversubscribed, ACI, along with 51 other holders of class 6 claims who had failed to timely make the election, received a blended distribution of pro rata and cash/equity formulations, both of which were undersubscribed by the voting claimants.

Hills' ballot certification did not reveal that ACI's ballots were received late, so ACI did not immediately learn of the tardiness of its vote and attempt to nip this problem in the bud. It was after ACI discovered that the Purchasers had not received their equity distributions that ACI communicated with Hills' balloting agent, only to be informed that because ACI's ballots were not timely received, Hills had determined to give both the blended treatment. The result did not affect ACI, which received the cash/equity distribution which it desired, but disappointed the expectations of the Purchasers, who did not receive the treatment which they desired.

ACI now seeks to have the ballot which it cast for the Purchasers deem timely received and the Purchasers given their equity election. In the alternative, ACI asks that the Purchasers be given an additional distribution of cash and/or notes equal in value to what they would have received had their ballot been counted. ACI posits that, if it does not prevail, the Purchasers will ask ACI to indemnify them for having failed to timely elect their requested equity distribution, which indemnification could cost ACI as much as $475,000.

At a chambers conference on this matter, I asked the parties to address in supplemental papers the issues of the possible res judicata effect of the confirmation order and the argument raised by Hills in its opposition that granting this relief would open a "pandora's box" and create an avalanche of motions filed by similarly situated claimants. In supplemental papers, Hills shifted gears somewhat, suggesting for the first time that ACI's motion should be denied, not only because of the avalanche problem, but also because to grant the relief ACI sought would result in an impermissible modification of Hills' substantially consummated plan. Hills did not address the res judicata issue, implicitly agreeing with ACI that there was no bar in this regard.

ACI suggests that this recently-raised impermissible modification argument is inapplicable, because all ACI seeks is allowance of its late-filed ballot, not a modification of Hills' plan. ACI also challenges Hills' avalanche argument, claiming that the documentation Hills has provided does nothing to further Hills' claim that there exist other, similarly situated claimants who may seek relief if this motion is granted. However, during oral argument, ACI's counsel retreated from this position and stated that I could consider as fact the existence of these other

claimants without the need for testimony. Because I find no excusable neglect on the part of ACI, I need not consider the res judicata and modification/substantial consummation arguments.

## II.

■ At the outset I would note, and ACI does not dispute, that its ballots were not timely received. In an analogous context, the United States Supreme Court noted that placing an item into the mails is not a filing. *United States v. Lombardo*, 241 U.S. 73, 78, 36 S.Ct. 508, 510, 60 L.Ed. 897 (1916); *accord In re Paul*, 101 B.R. 228, 229 (Bankr.S.D.Cal. 1989); *In re Allegheny International, Inc.*, 93 B.R. 910, 912 (Bankr.W.D.Pa.1988). Accordingly, the question becomes whether there is a basis for allowing the late ballots to be counted.

■ Bankruptcy Rule 9006(b)(1) empowers a bankruptcy court, upon a showing of excusable neglect, to enlarge the time within which a party is required to act. *Pioneer Investment Services Company v. Brunswick Associates Limited Partnership*, — U.S. —, — — —, 113 S.Ct. 1489, 1491–92, 123 L.Ed.2d 74 (1993). The burden of proving excusable neglect rests squarely on the movant which is seeking to enlarge its time. *In re R.H. Macy & Co., Inc.*, 161 B.R. 355, 360 (Bankr.S.D.N.Y.1993); *In re Nutri*Bevco*, 117 B.R. 771, 785 (Bankr.S.D.N.Y. 1990). The term "excusable neglect" is defined neither in the Bankruptcy Code nor in the Bankruptcy Rules. Until recently, this simple phrase was given a wide range of judicial interpretations.

■ In *Pioneer*, the United States Supreme Court finally settled a conflict in the circuits over the meaning of "excusable neglect" as that phrase is used in Bankruptcy Rule 9006(b)(1). There, the Court gave the phrase a flexible interpretation, holding that the term "neglect," as used in the phrase "excusable neglect," encompassed not only circumstances beyond the movant's control, but also simple, faultless omissions to act, and more commonly, omissions caused by carelessness. *Pioneer*, — U.S. at — , 113 S.Ct. at 1495. The Court noted that neglect includes failure to timely file a proof of claim

for reasons that are well within the claimant's control. *Id.* — U.S. at — , 113 S.Ct. at 1495–96. The Court reasoned that

> Congress plainly contemplated that the courts would be permitted, where appropriate, to accept late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control.
>
> In overseeing this latter process [Chapter 11], the bankruptcy courts are necessarily entrusted with broad equitable powers to balance the interests of affected parties, guided by the overriding goal of ensuring the success of the reorganization.
>
> [H]istory supports our conclusion that the enlargement of prescribed time periods under the "excusable neglect" standard of Rule 9006(b)(1) is not limited to circumstances where the failure to timely file is due to circumstances beyond the control of the filer.

*Id.* — U.S. at — , 113 S.Ct. at 1495–96. As the Court noted, the decision whether to grant permission to file a late claim is, at bottom, an equitable one, which takes into account all of the relevant circumstances surrounding the party's failure to file timely. *Id.* — U.S. at — , 113 S.Ct. at 1498. These factors include, but are not limited to:

1. the adequacy of the notice;
2. the danger of prejudice to the debtor;
3. the length of the delay and its potential impact on judicial proceedings;
4. the reason for the delay, including whether it was within the reasonable control of the movant and taking into account the movant's sophistication; and
5. whether the movant acted in good faith.

*Id.* — U.S. at — , 113 S.Ct. at 1489; *Macy*, 161 B.R. at 361; *In re Eagle–Picher Industries, Inc.*, 158 B.R. 713, 715 (Bankr. S.D.Ohio 1993).

■ The concept of "excusable neglect" is most often associated with the allowance of late-filed proofs of claim, but courts properly have applied the concept in deeming late ballots timely received. *See, e.g., Hanson v.*

*First Bank of South Dakota, N.A.,* 828 F.2d 1310, 1314 (8th Cir.1987); *In re Richard Buick, Inc.,* 126 B.R. 840, 849–50 (Bankr. E.D.Pa.1991); *Paul,* 101 B.R. 228; *In re Trails' End Lodge, Inc.,* 54 B.R. 898, 902 (Bankr.D.Vt.1985). In none of these cases, however, was a ballot deemed timely received after distribution had commenced under a confirmed plan of reorganization.

There is no question but that ACI was given adequate notice of the September 2nd ballot deadline. Each of the disclosure statement and order approving it, confirmation hearing notice, class 6 ballot and election subsection of the ballot made crystal clear that all ballots had to be received by Hills' balloting agent, not simply mailed, by September 2, 1993. Moreover, the class 6 ballot itself and the disclosure statement, in discussing class 6 treatment, stated that if a holder of the allowed class 6 claim failed to return his or her ballot to the ballot tabulator so that it was received on or before the ballot date, September 2, 1993, his or her elective distributive treatment would be made by Hills depending upon which treatments were undersubscribed.

Were I to grant ACI's request, this well could lead to litigation commenced by any of the 51 others who similarly did not timely remit their class 6 election ballots but have so far chosen not to litigate the issue. Moreover, this would send a clear signal to ING Bank, which has notified Hills that it claims to have mailed its ballot seeking an equity distribution but that its election was not honored because the ballot was never received. The 51 creditors hold claims totalling some $3 million; ING's claim totals $2.9 million. The litigation would cost Hills significant legal fees and also potentially would delay the final distribution to class 6 creditors while the late-filed ballot disputes were litigated. If the late-filed elections were counted, as ACI seeks here, final distributions to the creditors with timely ballots would be diminished. Hills has made the initial distributions to over eighteen hundred entities with allowed class 6 claims. Moreover, ACI is not asking that it receive what other class 6 creditors received; rather, it is seeking cash and notes equal in value to the stock distribution. This would be a distribution different from and probably better than that received by any other class 6 creditor. The stock option is no longer available, since all the stock was distributed. To give ACI stock, Hills would have to go into the marketplace and purchase that stock, which would affect Hills' cash flow, even assuming that Hills were free to purchase the stock. Since the creditors are the substantial owners of Hills, diminution of cash flow may negatively affect Hills' creditors.

Hills does not dispute that ACI has acted in good faith throughout and I cannot conclude otherwise. However, if ever there was a case in which the reason for the tardiness of a ballot was due to the conduct of the claimant, this is it. ACI offers no explanation for its tardiness in balloting except mailroom error. ACI's conduct was entirely within its reasonable control. Indeed, ACI admits in its papers that the ACI employee in charge of this matter did not read every provision in the disclosure statement, instead choosing to focus on only the provision of class 6's treatment, found on page 24 of the disclosure statement, which was couched in terms of "returning" the ballot. This reliance on the word "return" is a somewhat ludicrous explanation, given all the many places in different documents which contained unambiguous notice, including the face of the ballot itself, where the procedure was written in bold, uppercase letters, right under the case caption. Moreover, ACI waited from August 12, when Hills agreed to a bifurcated vote, until Monday, August 30th, almost three weeks later, to send the envelope containing its ballots to its mailroom for certified mailing, return receipt requested, when the deadline was that Thursday at 5:00 P.M. Certified mail would not have sped up the process but only guaranteed that ACI would receive confirmation that the contents had been received. Since the post office was required to obtain the signature of the recipient, there was certainly a possibility that this actually would delay receipt. Unlike the bar date in *Pioneer,* the deadline here figured prominently in several documents and in language understandable by even the lay person, although it hardly can be said that ACI, a sophisticated creditor and co-chair of Hills'

committee, could be considered a simple lay-person.

In weighing the equities here, one must not forget to look at the level of prejudice which ACI will sustain. Had ACI elected timely, it was not assured that the Purchasers for whom it was voting would receive all equity, for as discussed above, Hills' plan placed upper limits on the amount it was required to distribute under each option available to class 6. Indeed, no class 6 creditor received all equity because that option was oversubscribed. Unlike the typical *Pioneer* scenario in which claimants who do not prove excusable neglect are barred from sharing in the estate, ACI is not being deprived of sharing in this estate; it has received distributions from the same categories as a great many other claimants, both those who elected timely and those who did not. All that ACI has lost is the right to choose the type of distribution the Purchasers preferred. This is not heavy prejudice, if it is prejudice at all. The prejudice which ACI asserts does not result from anything that Hills did, for as stated above, Hills accommodated ACI's request for a bifurcated vote gave ACI distributions from the same categories which other class 6 creditors received. Any harm here results from the contract which ACI entered into with the Purchasers after the record date had passed.

In short, while one can empathize with ACI, ACI has not demonstrated excusable neglect. ACI has not shown that its failure to timely remit its ballot was due to any circumstances beyond its control or that its failure was excusable in light of events within its control, and in light of ACI's sophistication, the clarity of the balloting deadline, the potentially resulting prejudice to Hills, and the modest prejudice, if any there be, to ACI, ACI's motion must be denied.