In re KEENE CORP., Debtor.

Bankruptcy No. 93 B 46090 (SMB).

United States Bankruptcy Court,
S.D. New York.

Nov. 20, 1995.

Berlack Israels & Liberman (Edward S. Weisfelner, of counsel), New York City, for Keene Corporation.

Marcus Montgomery Wolfson, P.C. (John J. Preefer, Paula Hopping, of counsel), New York City, for the Official Committee of Unsecured Creditors.

Brobeck, Phleger & Harrison, LLP (Joy F. Forster, Frederick D. Holden, of counsel), New York City, for Fibreboard Corporation.

Fried, Frank, Harris, Shriver & Jacobson (Matthew Gluck, of counsel), New York City, for the Legal Representative for Future Claimants.

## MEMORANDUM DECISION DENYING FIBREBOARD'S MOTION TO FILE A LATE PROOF OF CLAIM

STUART M. BERNSTEIN, Bankruptcy Judge.

Fibreboard Corporation ("Fibreboard"), a co-defendant with the debtor, Keene Corporation ("Keene"), in many asbestos-related personal injury and property damage lawsuits, seeks leave to file a late claim, sounding in contribution or indemnity, pursuant to Fed.R.Bankr.P. 3003(c)(3) and 9006(b)(1). It argues that its failure to file a timely claim is due to "excusable neglect" as the Supreme Court construed that phrase in *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership,* 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993). The Official Committee of Unsecured Creditors (the "Committee"), the Legal Representative for Future Claimants (the "Legal Representative") and Keene oppose Fibreboard's application. For the reasons that follow, the Court denies the motion.

### FACTS

Keene filed its chapter 11 petition on December 3, 1993. At the time, Keene was a defendant in approximately 101,000 lawsuits involving asbestos-related property damage, personal injury and death. *Keene Corp. v. Acstar Ins. Co. (In re Keene Corp.),* 162 B.R. 935, 938 (Bankr.S.D.N.Y.1994). Fibreboard and Keene were co-defendants in hundreds if not thousands of these lawsuits. The filing of the bankruptcy stayed all actions against Keene, but the lawsuits continued against the other non-debtor co-defendants, including Fibreboard.

Many of these lawsuits had already been reduced to judgment. Fibreboard has paid Keene's share of two judgments, aggregating approximately $4.9 million, and may also have to pay Keene's share of a judgment in a third case. In addition, Fibreboard may eventually be required to pay Keene's share of eventual judgments in many other asbestos-related cases where liability and damages

have not yet been determined. Fibreboard, therefore, holds both liquidated and unliquidated claims against Keene.

After due notice and hearing, the Court signed an order dated September 28, 1994 (the "Bar Date Order"), that set December 5, 1994, as the last date for filing proofs of claim for creditors holding "non-asbestos related" claims. Under the Bar Date Order, this category included contribution and indemnity claims arising from asbestos-related liability. Some 2,609 entities, including Fibreboard, held such claims, but only 275 actually filed their claims before the bar date.[1] (Affidavit of Norman Weinstock ("Weinstock Aff."), sworn to Sept. 27, 1995, at ¶ 4.)

The Bar Date Order also approved a form of notice (the "Bar Date Notice"), and directed Keene to mail the Bar Date Notice to all known creditors holding, *inter alia,* "non-asbestos-related" claims. The Bar Date Notice caption, written in bold face type, states the following:

**NOTICE OF LAST DATE FOR FILING PROOFS OF CLAIMS FOR NON–AS-BESTOS–RELATED CLAIMS AND PROCEDURE THEREFOR.**

**TO: ALL CREDITORS, PRESENT AND FORMER EMPLOYEES, PAR-TIES–IN–INTEREST AND ANY OTHER PERSON OR ENTITY AS-SERTING OR ADVANCING A CLAIM AGAINST THE DEBTORS, EXCEPT HOLDERS OF ASBESTOS–RELATED CLAIMS.**

The succeeding text, appearing on the first page of the Bar Date Notice, makes it plain that the bar date applied to entities, like Fibreboard, who held asbestos-related contribution or indemnity claims:

The General Claims Bar Date and the procedure set forth below for filing Proofs of Claim apply to all Claims (as defined herein) against the Debtor, excluding Asbestos–Related Claims and the Claims re-

ferred to in paragraphs 2 or 3 below, *but including Claims for indemnity or contribution regarding asbestos-related liabilities, that arose or are deemed to have arisen before December 3, 1993.* [Emphasis added].

On October 18, 1994, Judy Koppelo, an employee of the Poorman–Douglas Corporation ("Poorman–Douglas"), Keene's claims agent, mailed six copies of the Bar Date Notice to Fibreboard at four different locations: Standard, California, Walnut Creek, California, Concord, California, and Fruita, Colorado. (See Exhibit to Declaration of Judy Koppelo of Service by Mail, dated Oct. 18, 1994 ("Koppelo Decl.").) Two of these notices were addressed to the attention of Michael R. Douglas, Fibreboard's in-house general counsel. (*Id.*) In addition, Ms. Koppelo mailed a seventh Bar Date Notice to Brobeck, Phleger & Harrison, LLP, Attn: Fred Holden, Esq., Fibreboard's outside counsel, but that mailing included an erroneous number in the five number zip code. On October 20, 1994, Keene also published the Bar Date Notice in the national edition of the Wall Street Journal and in the New York Times.

Poorman–Douglas's records reflect that the two notices sent to Fibreboard's Concord, California office were returned as undeliverable, but the other four notices sent to Fibreboard, and the notice sent to Mr. Holden, were not. (Affidavit of Debra Reyes ("Reyes Aff."), sworn to Oct. 17, 1995, at ¶ 5.) Fibreboard concedes that it received the Bar Date Notice at its Standard, California office—it was located in the files there—but no one at the Standard location recalls receiving it. (Affidavit of Charles W. LaGrave ("LaGrave Aff."), sworn to Aug. 31, 1995, at ¶ 8.) Fibreboard suggests that the Bar Date Notice was never received at the offices in Fruita, Colorado (See LaGrave Aff. ¶ 9), or Walnut Creek, California (*id.* ¶ 2; Affidavit of Michael R. Douglas, sworn to Oct. 13, 1995 ("Douglas Aff."), at ¶ 2), or at the Brobeck

---

1. These claims aggregate nearly $7.8 billion, but the amount is deceiving. Most of the filed claims do not specify a dollar amount, and one claim was filed in the approximate sum of $7.2 billion. (Weinstock Aff. ¶ 5.)

firm. (Affidavit of Frederick D. Holden, sworn to Oct. 12, 1995 ("Holden Aff."), at ¶ 3.)

According to Fibreboard's moving papers, it discovered the bar date by accident. In May or June of 1995, Mr. LaGrave, a member of Brobeck, Phleger & Harrison, LLP, was "surveying the status of various Chapter 11 proceedings of former defendants in the asbestos litigation." (LaGrave Aff. ¶ 2.) He reviewed the files located at his firm, as well as Fibreboard's headquarters, looking for "documents regarding the Chapter 11 proceeding of Keene, including, *inter alia*, a notice of the bar date," but did not find one in either set of files. (*Id.*) In June of 1995, however, LaGrave "learned through the review of public documents that a bar date had been set in the Debtor's Chapter 11 case of December 3 [*sic*], 1994," (*id.* ¶ 3), but he did not obtain a copy of the Bar Date Notice until June 30, 1995. (*Id.* ¶ 4.) Thereafter, his firm's New York office filed a notice of appearance in the case, and Fibreboard made the present motion.

## DISCUSSION

### A. Introduction

The Federal Bankruptcy Rules direct a bankruptcy court to establish bar dates in chapter 11 cases. Fed.R.Bankr.P. 3003(c)(3) requires the court to "fix and for cause shown may extend the time within which proofs of claim or interest may be filed." The bar date is critically important to the administration of a successful chapter 11 case, and the reorganization process:

> A bar order serves the important purpose of enabling the parties to a bankruptcy case to identify with reasonable promptness the identity of those making claims

against the bankruptcy estate and the general amount of the claims, a necessary step in achieving the goal of successful reorganization.... Thus, a bar order does not "function merely as a procedural gauntlet," ... but as an integral part of the reorganization process.

*First Fidelity Bank, N.A. v. Hooker Invs., Inc.* (*In re Hooker Invs., Inc.*), 937 F.2d 833, 840 (2d Cir.1991) (citing *United States v. Kolstad* (*In re Kolstad*), 928 F.2d 171, 173 (5th Cir.1991)); *accord Houbigant, Inc. v. ACB Mercantile, Inc.* (*In re Houbigant, Inc.*), 188 B.R. 347, 352 (Bankr.S.D.N.Y. 1995); *Maxwell Macmillan Realization Liquidating Trust & MCC GAO, Inc. v. Aboff* (*In re Macmillan*), 186 B.R. 35, 48–49 (Bankr.S.D.N.Y.1995). The bar date is akin to a statute of limitations, and must be strictly observed. *In re Macmillan*, 186 B.R. at 49; *In re Drexel Burnham Lambert Group, Inc.*, 129 B.R. 22, 24 (Bankr.S.D.N.Y.1991); *see Florida Dep't of Ins. v. Drexel Burnham Lambert Group, Inc.* (*In re Drexel Burnham Lambert Group, Inc.*), 148 B.R. 1002, 1005 (S.D.N.Y.1993).

A creditor may, however, file a late claim if it demonstrates that its failure to file a timely claim was due to "excusable neglect".[2] Fed.R.Bankr.P. 9006(b)(1). Before *Pioneer*, the Circuit Courts of Appeal had split on the meaning of "excusable neglect," and the Supreme Court granted *certiorari* to resolve the conflict. *Pioneer*, 507 U.S. at —— and n. 3, 113 S.Ct. at 1494 and n. 3.[3] The unique facts in *Pioneer* produced a holding which does not necessarily apply as easily to the ordinary chapter 11 case. To appreciate this conclusion, we recount the facts in *Pioneer* so that the contrast with those before us will be more apparent.

### B. *Pioneer* and Its Progeny

In *Pioneer*, the creditor filed its claim only 20 days late. 507 U.S. at ——, 113 S.Ct. at

---

2. The creditor has the burden of proving "excusable neglect." *In re Houbigant*, 188 B.R. at 354; *In re R.H. Macy & Co.*, 161 B.R. 355, 360 (Bankr. S.D.N.Y.1993).

3. The Supreme Court noted that in *650 Park Ave. Corp. v. McRae*, 836 F.2d 764, 767 (2d Cir.1988), the Second Circuit, interpreting "excusable neglect" under Fed.R.App.P. 4(a)(5), "required a

showing that the movant's failure to meet the deadline was beyond its control." *Pioneer*, 507 U.S. at —— n. 3, 113 S.Ct. at 1494 n. 3. *Accord In re Drexel Burnham Lambert Group, Inc.* 148 B.R. at 1005 ("excusable neglect" found only where failure to file a timely claim was due to "unique or extraordinary" circumstances beyond the creditor's control).

1492. The notice of the bar date was not contained in a separate notice, but instead, was combined with the notice of the section 341(a) meeting of creditors. *Id.* The president of the creditor received and read the notice, and attended the meeting of creditors. *Id.* The creditor also retained an experienced bankruptcy attorney who assured the creditor that no bar date had been set. *Id.*

Rationalizing the late filing, the creditor's attorney explained that he was experiencing a major disruption in his law practice. He had withdrawn from his firm only a few days before the bar date. *Id.* Because of this, he did not have access to his copy of the case file until after the bar date had passed. *Id.* at 1492–93.

■■ Affirming the Sixth Circuit, the Supreme Court held that the late filing was due to "excusable neglect." The Court expanded the definition of "excusable neglect" beyond the traditional formulation of "intervening circumstances beyond the party's control," and held that it also included "inadvertence, mistake, or carelessness." *Id.* at ——, 113 S.Ct. at 1495.[4] Ultimately, the Court stated, the determination is an equitable one that takes account of all of the surrounding circumstances:

> These include ... the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.

*Id.* at ——, 113 S.Ct. at 1498.

Although all of these factors played a role in the Court's decision, the pivotal factor was the "dramatic ambiguity" in the notice of the bar date. After noting that the debtor did

not challenge the lower court's findings regarding the creditor's good faith, the lack of prejudice to the debtor or the absence of any disruption to the efficient administration of the case caused by the late claim,[5] *id.*, the Court stated:

> We do, however, consider significant that the notice of the bar date provided by the Bankruptcy Court in this case was outside the ordinary course in bankruptcy cases. As the Court of Appeals noted, ordinarily the bar date in a bankruptcy case should be prominently announced and accompanied by an explanation of its significance. *See* 943 F.2d, at 678. We agree with the court that the "peculiar and inconspicuous placement of the bar date in a notice regarding a creditors['] meeting," without any indication of the significance of the bar date, left a "dramatic ambiguity" in the notification. *Ibid.*

*Id.* at —— – ——, 113 S.Ct. at 1499–1500. [Footnote omitted].

In *dicta*, the Court reemphasized the significance of the "unusual form of notice," and stated that if there were the slightest indication of bad faith, prejudice or adverse impact on the administration of the case, it would have reached the opposite result:

> To be sure, were there any evidence of prejudice to petitioner or to judicial administration in this case, or any indication at all of bad faith, we could not say that the Bankruptcy Court abused its discretion in declining to find the neglect to be "excusable." *In the absence of such a showing, however, we conclude that the unusual form of notice employed in this case requires a finding that the neglect of respondents' counsel was, under all the circumstances, "excusable."*

*Id.* at ——, 113 S.Ct. at 1500 (emphasis added).

---

**4.** The Court distinguished between inadvertence, mistakes and ignorance in construing rules, which do not usually constitute "excusable" neglect, 507 U.S. at ——, 113 S.Ct. at 1496; *accord United States v. Hooper,* 43 F.3d 26, 29 (2d Cir. 1994); *Weinstock v. Cleary, Gottlieb, Steen & Hamilton,* 16 F.3d 501, 503 (2d Cir.1994), and the same conduct under Rule 6(b) of the Federal Rules of Civil Procedure, dealing with the en-

largement of time within which to perform certain acts, which does. 507 U.S. at ——, 113 S.Ct. at 1496.

**5.** In fact, the debtor's plan took account of the claim. *Pioneer,* 507 U.S. at ——, 113 S.Ct. at 1499.

In the post-*Pioneer* period, many courts have wrestled with the relative weight to be given to the factors that the Supreme Court identified, and particularly, whether a court must find "excusable neglect" in the absence of prejudice. *Compare Greyhound Lines, Inc. v. Rogers (In re Eagle Bus Mfg., Inc.),* 62 F.3d 730, 737 (5th Cir.1995) (under *Pioneer,* the central inquiry is whether the debtor will be prejudiced); *In re Sacred Heart Hosp.,* 186 B.R. 891, 895 (Bankr.E.D.Pa.1995) ("[T]he danger of prejudice to the debtor and potential adverse impact of allowing a late claim on the debtor's reorganization process, are the polestars."); *and In re Herman's Sporting Goods, Inc.,* 166 B.R. 581, 585 (Bankr.D.N.J.1994) ("The finding of lack of prejudice and impact on judicial proceedings weigh strongly on the side of finding movant's neglect 'excusable.'") *with In re O.W. Hubbell & Sons, Inc.,* 180 B.R. 31, 35 (N.D.N.Y.1995) (despite absence of prejudice or adverse impact on the case, the creditor failed to prove "excusable neglect" where it did not provide a valid excuse for the delay, the delay was within the creditor's control, and the creditor may have acted in bad faith); *U.K. Northridge, Inc. v. Au Coton, Inc. (In re Au Coton, Inc.),* 171 B.R. 16, 18 (S.D.N.Y.1994) (although 18 day delay did not prejudice debtor or adversely impact on the case, carelessness in permitting bar date to lapse was not "excusable neglect"); *Nalco Chemical Co. v. LTV Steel Co. (In re Chateaugay Corp.),* 1993 WL 127180 at *6 (S.D.N.Y. Apr. 22, 1993) (without discussing prejudice, the district court affirmed the determination that a sophisticated creditor whose late claim was due to the failure of its own internal procedures, and who continued to do business with the debtor after commencement of the case, did not demonstrate "excusable neglect") *and In re Eagle–Picher Indus., Inc.,* 158 B.R. 713, 716 (Bankr. S.D.Ohio 1993) (notwithstanding the absence of prejudice to the debtor or adverse impact on the administration of the case, the "lack of a valid, documented excuse for its late claim, its express indifference regarding our bar date order, and ample notice of the bar date, taken together, outweigh the factors favoring allowance.").

We agree with this second group of cases, and conclude that an approach that considers all the relevant factors, but recognizes that they all need not point in the same direction, is the correct one. Conversely, we question the wisdom of an approach under which the court must ultimately ignore the creditor's culpability and permit the filing of a late claim if prejudice is absent. *See In re Sacred Heart Hosp.,* 186 B.R. at 895 ("[A] long and logically unjustified delay which nevertheless has no significant impact on the debtor's case should ... often be deemed excusable."). *Pioneer* does not stand for the proposition "no harm, no foul." Rather, it signifies to us that in the absence of any other factors weighing against the creditor, we should find "excusable neglect" if the bar date notice is ambiguous and unusual. *See Pioneer,* 507 U.S. at —— and n. 15, 113 S.Ct. at 1500 and n. 15. On the other hand, had the bar date notice in *Pioneer* been separate and conspicuous, as it is in the usual chapter 11 case, the language in *Pioneer* equally supports the conclusion that the Supreme Court would have reached the opposite result.

### C. Fibreboard's Motion and the *Pioneer* Factors

In most chapter 11 cases, the bar date notice is clear and unambiguous. This necessarily entails a more searching inquiry of the factors surrounding the late filing than was required in *Pioneer.* For sake of convenience, our inquiry divides the *Pioneer* factors into two categories: "fault" and "prejudice." "Fault" focuses on the reason for delay, whether it was in the creditor's control, and whether the creditor acted in bad faith. A determination of "fault" frequently turns on the adequacy of the notice of the bar date, the sophistication of the creditor, and whether the creditor had and followed its own internal procedures for dealing with such notices. *See, e.g., Nalco Chemical Co. v. LTV Steel Co. (In re Chateaugay Corp.),* 1993 WL 127180 at *6; *In re Eagle–Picher Indus., Inc.,* 175 B.R. 943, 945–47 (Bankr. S.D.Ohio 1994); *In re Hills Stores Co.,* 167 B.R. 348, 352–53 (Bankr.S.D.N.Y.1994).

"Prejudice," on the other hand, concerns not just the harm to the debtor but also the adverse impact that a late claim may have on the judicial administration of the case. The *Pioneer* Court did not define "prejudice," but the subsequent cases have identified a number of considerations. These include the size of the late claim in relation to the estate, whether a disclosure statement or plan has been filed or confirmed with knowledge of the existence of the claim, the disruptive effect that the late filing would have on a plan close to completion or upon the economic model upon which the plan was formulated and negotiated. *See, e.g., In re Eagle Bus Mfg., Inc.*, 62 F.3d at 737–38; *Manousoff v. Macy's Northeast, Inc. (In re R.H. Macy & Co.)*, 166 B.R. 799, 802 (S.D.N.Y.1994).

### 1. "Fault"

Although the evidence does not point to bad faith, we find that the other "fault" factors militate strongly against Fibreboard. At the outset, Fibreboard objects primarily to the content rather than the service of the Bar Date Notice. (Tr.[6] at 11.) In any event, Keene, through Poorman–Douglas, sent a total of six copies of the Bar Date Notice to four different locations. Although two of the notices were returned, four of the notices were not.

The law presumes that a properly addressed, properly mailed item is received by the addressee.[7] *In re O.W. Hubbell & Sons, Inc.*, 180 B.R. at 34; *In re Alexander's, Inc.*, 176 B.R. 715, 721 (Bankr. S.D.N.Y.1995); *In re R.H. Macy & Co.*, 161 B.R. at 359. The declaration testimony of Judy Koppelo is sufficient to establish the presumption because she states that she placed six Bar Date Notices, pre-addressed to four Fibreboard locations and with postage pre-paid, in a mail depository under the

control of the United States Postal Service. This shifts the burden to Fibreboard to rebut the presumption of receipt of the notice. *Meckel v. Continental Resources Co.*, 758 F.2d 811, 817 (2d Cir.1985). The presumed recipient cannot meet its burden, and rebut the presumption, merely by denying receipt, *In re O.W. Hubbell & Sons, Inc.*, 180 B.R. at 34; *In re Alexander's, Inc.*, 176 B.R. at 721; *In re R.H. Macy & Co.*, 161 B.R. at 360, and Fibreboard does not even try. To the contrary, it concedes that it found a copy of the Bar Date Notice in the files at one of the Fibreboard addresses to which it was mailed.

Instead, it aims its primary attack at the adequacy of the Bar Date Notice,[8] branding it ambiguous. Whether a writing is ambiguous is a question of law to be determined from the entire document. *Sayers v. Rochester Tel. Corp. Supplemental Management Pension Plan*, 7 F.3d 1091, 1094–95 (2d Cir.1993). To be ambiguous, a writing must be susceptible to more than one reasonable interpretation. *Id.* at 1095. Although Fibreboard suggests that the Bar Date Notice is ambiguous in a way similar to the notice in *Pioneer*, it is mistaken.

Unlike the notice in *Pioneer*, which was buried in the notice of a creditors' meeting, Keene's Bar Date Notice is overt, apparent and obvious. The bold face caption, quoted above, instantly warns the reader that he or she is dealing with a bar date for filing claims. Although the caption refers to "non-asbestos-related claims," the first paragraph on the first page states that these include "claims for contribution and indemnity regarding asbestos-related liabilities." The Bar Date Notice apprised any holder of such a claim that it had to file a claim by the December 5, 1994 bar date, and Fibreboard has not argued that it meant anything different to anyone who read it.

---

6. "Tr." refers to the transcript of the October 19, 1995 hearing held in connection with Fibreboard's motion.

7. The presumption does not apply to the Bar Date Notice sent to the Brobeck firm since it contained an incorrect zip code. We note, however, that the notice was never returned as undeliverable. (Reyes Aff. ¶ 5.)

8. At oral argument, Fibreboard's counsel stated that the adequacy of notice is the most important of the *Pioneer* factors. (Tr. at 9.)

Instead, Fibreboard contends that it was reasonable not to read beyond the caption because of the misleading nature of the Bar Date Notice. Specifically, Fibreboard points. to the language in the caption that states that the Bar Date Notice applies to "non-asbestos-related claims." At oral argument, Fibreboard's counsel hypothesized that the Fibreboard employee or employees who opened the mail saw the caption on the Bar Date Notice and read no further because they assumed that it did not apply to Fibreboard. (Tr. at 28.)

The speculation about what Fibreboard's mail room employees did with the Bar Date Notice hardly satisfies it's burden of proof, and borders on the nonsensical. Fibreboard did not produce a witness who testified that he or she was confused by the caption, and therefore, ignored the Bar Date Notice. Moreover, "asbestos-related" is not a term of art whose meaning would have been apparent to the Fibreboard employees who opened the mail. Yet to accept Fibreboard's argument, we would have to assume that the employees who open the mail at each location. that was served knew Fibreboard held claims for contribution or indemnity against Keene, understood these to be "asbestos-related" in nature, and based upon the caption, concluded that it was unnecessary to read this manifest legal document which described a statute of limitations for filing claims.

Further, in an attempt to demonstrate its diligence in the face of a clear notice, and to distinguish itself from other, similar creditors who might seek to file late claims in the future, Fibreboard ignores its own submissions. At oral argument, its counsel stated that as soon as it received the notice of the hearing on the disclosure statement—mailed in late June, 1995—it immediately sprung into action, determined that it had a claim it had not filed before the bar date, and made the instant motion. (Tr. at 17–18.) Counsel argued that this distinguished Fibreboard from other creditors who had not yet sought leave to file late claims, suggesting that the Court could rely upon this distinction to stem the tide of future late claims. (Tr. at 35.)

Nothing in the record, however, refers to the notice regarding the hearing on the disclosure statement much less states that it had this triggering effect. Mr. LaGrave, the only witness on this issue, stated that he undertook a status search in May or June of 1995, and as a result of reviewing public documents, which he does not identify, learned about the bar date. (LaGrave Aff. ¶ 3.) He never mentioned the hearing on the disclosure statement. This confirms our concern, discussed below, that there may not be any basis to distinguish between the "equitable considerations" that govern Fibreboard's motion and those that will determine future motions by other creditors who might seek to file late claims.

We conclude, therefore, that the nature of the notice in this case is clear and unambiguous, and did not "ambush" Fibreboard. In addition, the other "fault" factors point away from a finding of "excusable" neglect. For example, Fibreboard is a sophisticated creditor, represented by able counsel, and is very active in an industry populated by chapter 11 debtors. (Tr. at 24.) In this regard, Keene's is the eighteenth asbestos bankruptcy case. Margaret A. Jacobs & Wade Lambert, *Asbestos Action to Limit Claims is Thrown Out*, WALL ST. J., Dec. 2, 1993, at A3. Fibreboard was a co-defendant with many of these debtors. Mr. LaGrave was sufficiently in tune with these bankruptcy cases to survey their status, and he knew enough to look for a bar date during these surveys (LaGrave Aff. ¶ 2), which, in Keene's case, was also published once in the Wall Street Journal and the New York Times. Further, Mr. Holden, another member of the Brobeck firm, has overseen the filing of timely claims on behalf of Fibreboard in several other asbestos bankruptcies, including *Johns–Manville Corporation, Eagle Picher Industries, H.K. Porter* and *Celotex Corporation*. (Holden Aff. ¶ 11.)

The evidence also supports the finding that Fibreboard had no internal procedures relating to how it dealt with legal notices, or if it did, that they broke down. Fibreboard did not offer any evidence concerning the proce-

dures it followed in its outlying offices when they received legal notices. Indeed, while Fibreboard admits to locating a copy of the Bar Date Notice in its Standard, California files, no one has come forward to explain how it got into the files without anyone advising counsel that it had been received.

While Fibreboard's general counsel offered some evidence regarding the procedures that he follows, his affidavit proves a communication breakdown at the highest levels of Fibreboard. Mr. Douglas does not recall being served with the Bar Date Notice. (Douglas Aff. ¶ 2.) Yet he states in his affidavit that he was away from his office during the week that Poorman–Douglas served the Bar Date Notice, (id. ¶¶ 4–5), and does not identify who, if anyone, covered his matters and dealt with his emergency mail during his absence, or whether he reviewed that mail when he returned.[9] In addition, Mr. Douglas did not find out about the bar date until October 1995. (Id. ¶ 4.) Mr. LaGrave of the Brobeck firm, however, learned of the bar date in June, 1995, and his firm made the instant motion and filed a notice of appearance in September. If Mr. Douglas did not know about or authorize this motion, who at Fibreboard did?

■■■ We conclude, therefore, that Keene served and Fibreboard received a clear and unambiguous notice of the bar date,[10] and Fibreboard did not file a timely claim due largely to a breakdown in its internal proce-dures and communications. Further, Fibreboard is a sophisticated, experienced and well-represented creditor in chapter 11 asbestos bankruptcies, knew the importance of bar dates and searched them out during its independent status checks. Its failure to file a timely claim was caused by circumstances solely within its control, and Fibreboard has failed to offer any cogent argument to the contrary.

## 2. "Prejudice"

This leaves us to consider the related factors of prejudice to the debtor and the adverse impact of the delay on the case—collectively, prejudice—if we allow Fibreboard to file its claim. Considering "prejudice" involves a certain amount of crystal ball gazing. The exercise requires us to predict the adverse effect of a late claim on the debtor and on the administration of the case. In the present case, prejudice is a close question although the amount of prejudice is certainly greater than *Pioneer*.

Nine months separate the bar date from the filing of this motion. In the interim, Keene, the Committee and the Legal Representative negotiated a consensual plan. The hearing on their disclosure statement, which has been adjourned from time to time, is now scheduled for November 30, 1995. Reaching a consensual resolution has been slow, contentious and difficult to achieve.[11] We are loath to introduce any element, particularly a

9. In contrast, Mr. Holden of the Brobeck firm stated that when he is away from his office, someone goes through his mail and may immediately deal with some matters, but when he returns he reviews all of the mail sent to him in his absence. (Holden Aff. ¶ 10.)

10. Accordingly, we reject Fibreboard's due process challenge to the notice of the bar date. To satisfy due process, Keene had to serve the Bar Date Notice on Fibreboard, a known creditor, in a manner "reasonably calculated, under all the circumstances to apprise" it of the bar date. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950); *accord City of New York v. New York, N.H. & H.R. Co.*, 344 U.S. 293, 296, 73 S.Ct. 299, 301, 97 L.Ed. 333 (1953). The Supreme Court has "repeatedly recognized that mail service is an inexpensive and efficient mechanism that is reasonably calculated to provide actual notice." *Tulsa Professional Collection Servs., Inc. v. Pope*, 485 U.S. 478, 490, 108 S.Ct. 1340, 1347, 99 L.Ed.2d 565 (1988). As the preceding discussion shows, Keene's notice met these requirements.

11. The parties' inability to communicate effectively eventually led the Court to enter an unusual order in December, 1994. Following an evidentiary hearing in connection with Keene's motion to extend exclusivity, we appointed an examiner to supervise plan negotiations and report back to the Court. To ensure that supervised negotiations took place, we *directed* the parties to meet every Thursday afternoon from at least 2:00 p.m. to 5:00 p.m., and gave them the option to meet more frequently. In a separate order, the Court approved the United States Trustee's application to appoint the Hon. William H. Webster as examiner. Judge Webster, with the assistance of

creditor with a substantial claim, into the mix which may upset it.

In addition, allowing Fibreboard's claim could adversely affect the administration of the case by possibly opening the floodgates to many similar claims. *See In re Hills Stores Co.*, 167 B.R. at 352; *In re Specialty Equipment Cos.*, 159 B.R. 236, 239 (Bankr. N.D.Ill.1993); *cf. In re Beltrami Enters., Inc.*, 178 B.R. 389, 392 (Bankr.M.D.Pa.1994) (no prejudice where "[n]o evidence was placed on the record to indicate that there were hordes of claimants ready to file claims should [the moving creditor] be allowed to file its claim late."). Only 275 of the 2,069 creditors holding asbestos-related contribution or indemnity claims have filed timely claims, and these claims aggregate nearly $8 billion. (Weinstock Aff. ¶ 4). We would be hard-pressed to distinguish Fibreboard's situation from any other similar creditor who ignored the Bar Date Notice, and to allow one may invite similar litigation from others. *In re Hills Stores Co.*, 167 B.R. at 352. In such a case, the legal fees the estate would potentially expend in litigating these matters supports a finding of prejudice. *See id.*

On the other hand, other factors militate against finding prejudice. Under the proposed plan, the contribution and indemnity claims have been placed in a class which will be paid out of a creditors' trust, and no bar date has been set for the personal injury claims that have been put in the same class. Further, although the principal constituents have negotiated and published a plan, it has not been confirmed. Finally, while Fibreboard's claim—consisting of liquidated and unliquidated amounts—is large, it does not seem, standing alone, to be material when compared with all the other claims.

### CONCLUSION

Upon consideration of all of the *Pioneer* factors, we conclude that Fibreboard has failed to show "excusable neglect." A contrary result could only be based upon the speculative prejudicial effect of its late claim,

and ultimately, justified through the redrafting of Federal Bankruptcy Rule 9006(b)(1) to replace "excusable neglect" with "absence of prejudice." Fibreboard did not even take this position. (*See* Tr. at 32.) In the final analysis, if we allow Fibreboard to file this late claim, we do not see how we could deny any other creditor the same privilege prior to confirmation of the plan.

SETTLE ORDER ON NOTICE.

his law firm, was able to bring about the negotia-    tion of the consensual plan.