IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 11, 2004 Session

# MAE ELLEN WILLIAMS, ET AL. v. BAPTIST MEMORIAL HOSPITAL, ET AL.

**A Direct Appeal from the Circuit Court for Shelby County**
**No. CT-007191-01     The Honorable James F. Russell, Judge**

---

**No. W2003-02872-COA-R3-CV - Filed December 30, 2004**

---

This is a medical malpractice case. Appellants appeal from the trial court's grant of summary judgment in favor of Appellees, a doctor and her employer. The trial court found that the affidavit of Plaintiffs/Appellants' expert was inadmissible because it was filed after the deadline for identifying experts and that such late filing was not excusable neglect under Tenn. R. Civ. P. 6.02. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J., joined and ALAN E. HIGHERS, J. dissents, with separate Opinion

Mimi Phillips and R. H. "Chip" Chockley of Memphis for Appellants, Mae Ellen Williams, Percy Williams and Mytina Singleton, Conservator for Mae Ellen Williams

Sherry S. Fernandez and Harold W. McLeary, Jr. of Memphis for Appellees, Becky Wright, M.D., and Metropolitan Anesthesia Alliance

## OPINION

This is a medical malpractice case. Appellants appeal from the trial court's grant of summary judgment in favor of Appellees, a doctor and her employer. The trial court found that the affidavit of Plaintiffs/Appellants' expert was inadmissible because it was filed after the deadline for identifying experts and that such late filing was not excusable neglect under Tenn. R. Civ. P. 6.02. We affirm.

On December 5, 2000, 57-year-old Mae Ellen Williams went to the emergency room at Baptist Memorial Hospital ("BMH") with a history of epigastric pain that started at midnight on December 4, 2000. The pain radiated down her abdomen and into her right shoulder and arm and

she was unable to lie down. While in the emergency room, Ms. Williams was seen by Dr. Janice L. Garrison, a cardiologist employed by Cardiology Specialists of Memphis, PC ("CSM"). Dr. Garrison diagnosed pancreatitis and acute cholelithiasis and ordered a gastrointestinal consult. In the process of gaining this diagnosis, Dr. Rolando Leal, an employee of Gastoenterology Center of the Mid-South, PC ("GCM"), performed an endoscopic retrograde cannulation of the common bile and pancreatic ducts with radiographic dye. Dr. Garrison referred Ms. Williams to Dr. Janice Wood, a surgeon employed by Health First Medical Group, PLLC ("HFMG").

On December 7, 2000, Ms. Williams was scheduled for a laparoscopic cholecystectomy (gallbladder removal) with Dr. Wood. Dr. Becky C. Wright, an employee of Metropolitan Anesthesiologist Alliance, PLLC ("MAA," and together with Dr. Wright, "Appellees"), administered anesthesia to Ms. Williams.[1] Dr. Wright made four (4) attempts to establish an airway with an endotracheal tube. During one of these attempts, one of Ms. Williams' teeth was knocked out. Dr. Wright was able to establish an airway on the fifth try. Once the endotracheal tube was placed, Dr. Wood performed the surgery. Following the surgery, Ms. Williams was extubated at the direction of Dr. Wright. Following the extubation, Ms. Williams was not able to breathe on her own and an attempt was made to re-intubate. During the effort to re-intubate, Ms. Williams' vital signs became undetectable and efforts were abandoned, although she was not pronounced dead. Shortly after medical and hospital personnel ceased efforts to revive Ms. Williams, she was observed to be breathing on her own. Immediate and ultimately successful measures were taken to establish an airway by re-intubation. Either during or immediately following the surgery, Ms. Williams suffered irreversible encephalopathy. Ms. Williams was placed on life support and remained in a comatose or semi-comatose state until she died on April 24, 2002.

The original Complaint in this matter was filed on November 30, 2001 by Mae Ellen Williams, her husband Percy Williams, and Mytina Singleton, Ms. Williams' daughter and her Conservator (together "Plaintiffs," or "Appellants"). The Complaint was amended on December 17, 2001.

Dr. Wright and MAA filed their Answer on February 19, 2003. On January 31, 2003, a "Consent Scheduling Order" (the "Scheduling Order") was filed. The Scheduling Order states, *inter alia*, that:

---

[1] This medical malpractice case was originally filed against Dr. Woods, Dr. Garrison, Dr. Wright, BMH, HFMG, CSM, MAA, and numerous other hospital employees. The first amendment to the Complaint added Dr. Leal and GCM as Defendants. The Second Amended Complaint, filed on or about October 16, 2003, shows only BMH, Dr. Wood, HFMG, Dr. Wright, MAA, Dr. Garrison and CSM as Defendants. On August 22, 2003, Plaintiffs filed a Motion for Voluntary Nonsuit as to Dr. Woods, HFMG, Dr. Garrison, CSM, Dr. Leal, and GCM. On August 22, 2003, a "Consent Order of Voluntary Non-Suit as to Rolando Leal, M.D. & Gastroenterology Center of the Mid-South, P.C. Only" was entered. On October 30, 2003, the trial court granted summary judgment to Dr. Garrison and CSM. On October 31, 2003, the trial court entered an Order granting summary judgment in favor of Dr. Wood and HFMG. On November 4, 2003, the trial court entered an Order granting final judgment in favor of BMH. Plaintiffs appeal only from the trial court's Order granting summary judgment to Dr. Wright and MAA. Although the record before us contains numerous documents either filed by or relating to individuals or entities not parties to this appeal, in the interest of clarity and economy, we will limit our discussion of the facts and procedure to those bearing directly upon the issues before us.

1.  Plaintiff shall identify any expert who will be called to testify at the trial of cause and shall supplement expert interrogatories, if any, with respect to same on or before April 15, 2003.

2.  Plaintiff shall produce any expert to be used at the trial of this cause to defense counsel for a discovery deposition, if desired, on or before June 1, 2003.

Following a later scheduling conference, the trial court entered an "Order on Scheduling Conference" on March 24, 2003. This Order reads, in pertinent part, as follows:

The Court, therefore, denied the Defendant's Motion to Modify Scheduling Order and set the entire [January 31, 2003} Scheduling Order aside. In addition, the Court established a deadline for Plaintiffs identification of experts of July 1, 2003. All pending Motions for Summary Judgment will be set for hearing on Friday, August 29, 2003. All materials related to the Summary Judgment Motions shall be submitted to the Court by August 22, 2003.

On July 25, 2003, Dr. Wright and MAA filed a Motion for Summary Judgment based, in part, upon Plaintiffs' lack of expert proof. On August 15, 2003, Dr. Wright filed her Affidavit in support of the Motion for Summary Judgment. On August 22, 2003, Plaintiffs filed a "Response to Motion for Summary Judgment of Becky B. Wright and Metropolitan Anesthesia Alliance, PLLC" (the "Response"). Exhibited to the Response was the Affidavit of Ronald J. Gordon, M.D., an expert in anesthesiology, which reads, in relevant part, as follows:

I, RONALD J. GORDON, M.D., after having been first duly sworn, state as follows:

1.  I am a medical doctor, licensed to practice in the State of Tennessee. I maintain a private practice at 185 Hospital Road, Winchester, Tennessee 37398.

2.  I have been licensed to practice medicine in the State of Tennessee since 1982. I practiced this profession in the State of Tennessee throughout the year 2000.

3.  My practice is specialized in the field of anesthesiology, and I am Board Certified by the American Board of Anesthesiology.

4.  My Curriculum Vitae is attached to this Affidavit as Exhibit 1, and is incorporated herein by reference.

5.  I am familiar with the recognized standard of acceptable professional medical care in the metropolitan areas of Tennessee and specifically in Memphis, Tennessee and similar communities, as it existed in December of 2000.

6.  In forming the opinions expressed in this Affidavit, I have reviewed the Baptist Memorial Hospital ER records, History and Physical, Operative Report, Anesthesia Record, Radiology Records, Physician's Orders and Progress Notes, Resuscitation Record and Consult Notes from December 2000, Discharge Summary from June 2001, Baptist Hospital Records associated with the cancelled January 1992 surgery, and deposition excerpts from Thelma Nelms and Mytina Singleton.

7.  I have assumed the factual statements made by Ms. Nelms and Ms. Singleton are true and that the notations in Ms. Williams' medical chart at Baptist are accurate, except as indicated otherwise in this Affidavit.

8.  Ms. Williams was scheduled for a laparoscopic cholecystectomy at Baptist Memorial Hospital on December 7th, 2000.  This was not an emergency procedure and delay would not have put Ms. Williams at significantly increased risk.  A preanesthesia note was completed wherein it was documented that Ms. Williams was 5 feet 2 inches tall and weighed 215 pounds.  This would give her a body mass index of 39 and classify her as significantly obese.  It was also noted that Ms. Williams had a class 3 (out of 4) airway.  This suggests a potential[ly] difficult airway.  It is well-known that markedly obese individuals tend to drop their oxygen levels during anesthesia induction much more rapidly than non-obese individuals, and this fact, combined with a class 3 airway would suggest that Ms. Williams would require special care in the administration of her anesthetic, including 5 full minutes of pre oxygenation.  The fact that Ms. Williams had a documented history of being difficult to intubate, in light of these prior considerations, would require that Ms. Williams have an awake intubation.  This is the unequivocal standard of care in a situation like this and the failure to perform an awake intubation was the proximate cause that ultimately led to Ms. Williams' untimely demise.

9.  Ms. Williams had anesthesia induced for a laparoscopic cholecystectomy at 11:20 AM on 12/7/2000.  It is noted that Ms. Williams was difficult to intubate and required 5 attempts, intubation ultimately being achieved with a #6 endotracheal tube.  Repeated

-4-

attempts at intubation traumatize the airway and larynx and lead to swelling; this in turn narrows the passage for gas transport and leads to difficulty in ventilation purely through mechanical means. For this reason, in modern anesthesia practice in the year 2000, anesthesiologists limit their attempts at intubation to 2 or 3, and then turn to some other form of airway management, or simply come back another day. This would certainly be possible in an elective case such as a cholecystectomy. The fact that 5 separate attempts were made at endotracheal intubation is a violation of the standard of care and was the next in a series of missteps that lead to the unfortunate outcome in this patient.

10. Ms. Williams' surgery was completed at 12:38 PM and she arrived still intubated in the recovery room (PACU) at 1:08 PM. Her initial PACU or PAR score was 5. This is a universally accepted measure of a patient's "ready" status for discharge from the PACU, and 5 is a very low number, indicating an unstable patient. At 1:35 PM Ms.Williams was extubated by anesthesia even though she still had a PAR score of 5 and was clearly a very difficult intubation as noted by the 5 separate attempts. It is below the standard of care to extubate a patient in this condition and with this known history, and the anesthesia team should have certainly waited until Ms. Williams was more awake and stable. This premature and inappropriate extubation, a clear standard of care violation, was the next misstep leading to the hypoxic event from which Ms. Williams could not recovery.

11. Following extubation in the PACU, it became clear early on that Ms. Williams was suffering from fulminant pulmonary edema which greatly interferes with a patient's ability to get oxygen to their lungs. The multiple attempts at intubation in surgery, and the fact that only a 6 tube could be passed (a larger #7 tube is usual) all suggest upper airway edema. Upper airway obstruction secondary to edema, especially partial upper airway obstruction, leads by a well-known mechanism to "negative pressure pulmonary edema." This complication, common in young healthy adults following a bout of laryngospasm, is treated with lasix and positive end expiratory pressure. It appears that this episode of negative pressure pulmonary edema was unrecognized and untreated, a standard of care violation that moved Ms. Williams another step closer to irreversible brain damage from hypoxia.

12. In the PACU at 1:50 PM, Ms. Williams was noted to be apneic and she was reintubated by anesthesia. For some reason not clear from the records, she was then reextubated and again reintubated. Again there was no mention of the use of lasix to relieve what was clearly an ever-worsening pulmonary edema, depriving Ms. Williams' brain of more and more oxygen. This second extubation and reintubation, with no clearly documented reason, is an additional standard of care violation, and sealed the fate of this unfortunate patient.

13. It is my opinion that had Ms. Williams received the appropriate anesthetic care to which she was entitled, none of her injuries would have occurred. At the hearing on August 29, 2003, the trial court did not hear argument, nor did it rule on any of the pending motions for summary judgment. Instead, the trial court cited procedural problems with the case, including the failure of Plaintiffs to file a motion to substitute the estate of Ms. Williams. The court set all outstanding motions for hearing on October 17, 2003.

On September 12, 2003, Dr. Wright and MAA filed a "Motion to Dismiss" pursuant to Tenn. R. Civ. P. 25.01 based upon Plaintiffs' failure to substitute parties following Ms. Williams' death.

On October 16, 2003, Plaintiffs filed a Motion to Amend Complaint, seeking to reflect a substitution of parties and revise the theories of liability to match those of Plaintiffs' experts. This Motion was ultimately denied by the trial court at the October 17, 2003 hearing. On October 17, 2003, Plaintiffs filed a "Motion to Enlarge Time Pursuant to Rule 6.02," requesting the trial court to extend the July 1, 2003 deadline set out at the scheduling conference. The Motion reads, in relevant part, as follows:

3. Plaintiffs would show that their failure to timely identify experts in this case has been the result of excusable neglect, as is set forth more particularly in the attached affidavits of one of Plaintiffs' attorneys and that attorney's paralegal. For purposes of summary [sic] here, Plaintiffs state that it became known to counsel during the deposition of decedent's sister, taken on March 31, 2003, that several years prior to the surgery at issue in this lawsuit, decedent had been scheduled for a gynecological operation, but that it was cancelled because the decedent proved too difficult to intubate.

One of the major issues in this case is the alleged malpractice of the anesthesiologist in choosing the intubation for this patient and in handling the intubation. Experts [that] the Plaintiffs contacted informed Plaintiffs that whether the sister's testimony was true, and

whether it was documented would make a significant difference in their opinions.

> As set forth in the attached affidavits, the information was true, and, in fact the aborted surgery had occurred at the Defendant Baptist Hospital in 1992. Plaintiffs' counsel made repeated and dogged efforts to secure the records, even in the face of being told by Baptist personnel on at least one occasion, that they did not exist.

> Nevertheless, the records were finally secured from the hospital by Plaintiffs' counsel, on or about August 6, 2003. They were immediately tendered to the experts Plaintiffs had contacted to review the case.

> 4. Accordingly, Plaintiffs submit that their neglect to submit physician affidavits by July 1, 2003, in compliance with this Court's Order, was the result of excusable neglect, and not the result of any dilatory conduct or carelessness on the part of counsel. The Gordon affidavit was submitted 16 days after the necessary records were procured.... Plaintiffs submit that this does not reflect an inexcusable delay. Rather, Plaintiffs have erred in not filing the present Motion to enlarge time until now. Nevertheless, Plaintiffs submit, the failure to timely file the affidavits should be judged on the criteria set forth in Rule 6.02.

At the October 17, 2003 hearing, the trial court denied Plaintiffs' Motion to Enlarge Time. The trial court also considered and found "clearly insufficient" the affidavit of Plaintiffs' expert Dr. Gordon. Finally, the trial court granted Dr. Wright and MAA's motion for summary judgment. An Order was entered on October 30, 2003.

Appellants appeal from the Order of the trial court, granting summary judgment to Dr. Wright and MAA. Appellants raise two issues for review as stated in their brief:

> 1. The Trial Court failed to apply the correct legal standard in ruling upon the Defendants' Motion for Summary Judgment, by improperly taking judicial notice of certain "facts", failing to consider the summary judgment motion of Dr. Wright separately on its merits, and failing to properly evaluate Plaintiffs' expert affidavit in accordance with Tennessee medical malpractice law.

> 2. The Trial Court abused its discretion in denying Plaintiffs' Motions to Amend the Scheduling Order by failing to properly

evaluate or consider Plaintiffs' "excusable neglect" in missing a deadline to identify experts.

The ultimate issue before this Court is whether the trial court erred in granting summary judgment to Dr. Wright and MAA. In order to reach this question, however, we must first determine whether the Affidavit of Dr. Gordon was properly excluded by the trial court. This analysis is a two-part inquiry. First, we must determine whether the trial court erred in concluding that Dr. Gordon's Affidavit was insufficient on its face. If we determine that the Affidavit was sufficient to establish a genuine dispute of material fact, we must then determine whether the trial court erred in excluding the Affidavit because it did not meet the deadline for identifying experts as found in the March 24, 2003 Order.

Sufficiency of Dr. Gordon's Affidavit

T.C.A. § 29-26-115 (Supp. 2000) describes the burden upon Plaintiffs in medical malpractice actions and reads, in pertinent part, as follows:

> (a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided in subsection (b):
>
> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
> (3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.
>
> (b) No person in a health care profession requiring a licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred....

In essence, T.C.A. § 29-26-115 imposes five substantive requirements on expert affidavits. The affiant must demonstrate that he or she meets the geographic and durational residence and practice

requirements (§ 29-26-115(b)). Next, the affiant must demonstrate that he or she practices in a profession or specialty that makes the affiant's opinion relevant to the issues in the case (§ 29-26-115(b)). Third, the affiant must demonstrate that familiarity with the recognized standard of professional practice in the community where the defendant practices or in similar communities (§ 29-26-115(a)(1)). Fourth, the affiant must give an opinion concerning whether the defendant physician met or failed to meet the relevant standard of professional practice ((§ 29-26-115(a)(2)). Finally, the affiant must opine whether the defendant physician's negligence more likely than not caused the patient injuries that he or she would not otherwise have suffered (§ 29-26-115(a)(3)). **Church v. Perales**, 39 S.W.3d 149, 166 (Tenn. Ct. App. 2000).

This Court has admonished attorneys to couch their medical experts' affidavits in the language of T.C.A. § 29-26-115 to avoid summary judgment problems. **See, e.g., Gambill v. Middle Tenn. Med. Ctr.**, 751 S.W.2d 145, 148 (Tenn. Ct. App. 1988). However, failure to use the specific statutory language is not, necessarily, fatal to the admission of experts' affidavits:

> ...we recognize that a mere ritualistic incantation of statutory buzz words evidences very little. Accordingly, when an expert's opinion is challenged, we will determine whether the opinion is based on trustworthy facts or data sufficient to provide some basis for the opinion. **See generally McDaniel v. CSX Transp., Inc**., 955 S.W.2d 257, 265 (Tenn.1997). We neither assay the expert's credibility nor determine the evidentiary weight that should be given to the experts' opinion. Rather, we merely look to see if the challenged opinion has some legally-acceptable basis from which its conclusions could be rationally drawn. **See DeVore v. Deloitte & Touche**, No. 01A01-9602-CH-00073, 1998 WL 68985, at *9-10 (Tenn.Ct.App. Feb.20, 1998) (No Tenn.R.App.P. 11 application filed) (affirming summary judgment where proffered expert testimony lacked a trustworthy basis). Expert opinions having no basis can properly be disregarded because they cannot materially assist the trier of fact. Nor can they create genuine disputes of material fact at summary judgment stage.

**Church**, 39 S.W.3d at 166-67.

In this case, the trial court made the following, relevant, statements in reaching its conclusion that Dr. Gordon's Affidavit was insufficient:

> Dr. Gordon's affidavit simply generically says he is familiar with the standard of medical care. It is not specific as to whom that would be applicable [to] among the various Defendants. The affidavit says nothing specifically about what standard of care was violated by what Defendant and in what way.

*    *    *

> It is this Court's observation that [Dr. Gordon's Affidavit has] been hurriedly put together just to comply with the scheduling Order deadline so that some response could be filed by August 22, 2003.

Respectfully, we disagree with the trial court's interpretation of the Affidavit. It is true that, in paragraph five, Dr. Gordon makes a general statement that he is "familiar with the recognized standard of acceptable professional medical care...in Memphis, Tennessee." However, in paragraph three, Dr. Gordon specifies that his specialty is in anesthesiology. Taking these paragraphs together, we can properly infer that Dr. Gordon's familiarity with the standard of medical care encompasses anesthesiology in particular. The trial court also expresses concern with the fact that Dr. Gordon's Affidavit allegedly says nothing about which Defendant violated the standard of care. We disagree. It is undisputed in this record that Dr. Wright was the only anesthesiologist to render treatment to Ms. Williams. Consequently, any statements in Dr. Gordon's Affidavit concerning alleged violations of the standard of care in rendering anesthesia to Ms. Williams are properly attributable to Dr. Wright, she being the only doctor to administer these procedures. We find, therefore, that Dr. Gordon's Affidavit, although it does not strictly adhere to the statutory language, nonetheless satisfies the requirements thereof. Consequently, the trial court erred in finding that the Affidavit is insufficient on its face.

We now turn to the question of whether the trial court erred in not granting the Tenn. R. Civ. P. 6.02 Motion to extend the time outlined in the scheduling Order and thus allow for the filing of Dr. Gordon's Affidavit.

Tenn. R. Civ. P. 6.02

Tenn. R. Civ. P. 6.02 reads, in relevant part, as follows:

> When by statute or by these rules or by a notice given thereunder or by order of court an act is required or allowed to be done at or within a specified time, the court for cause shown may, at any time in its discretion...(2) upon motion made after the expiration of the specified period permit the act to be done, where the failure to act was the result of excusable neglect....

In *Sizemore v. United Physicians Ins. Risk Retention Group*, 56 S.W.3d 557 (Tenn. Ct. App. 2001), this Court addressed excusable neglect and outlined certain factors that the trial court should consider when making its determination on a Tenn. R. Civ. P. 6.02 motion, to wit:

> Still, not all negligence can be indulged. To do that would read out of the excusable neglect principle the requirement that the neglect must first be found excusable. Finding whether neglect is excusable is an

-10-

equitable determination "taking account of all relevant circumstances surrounding the party's omission." ***Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship***, 507 U.S. at 395, 113 S.Ct. at 1498; ***Dubuc v. Green Oak Township***, 958 F.Supp. 1231, 1241 (E.D.Mich.1997). The relevant circumstances envelop the big picture of both causes and effects, including (1) the danger of prejudice to the party opposing the late filing, (2) the length of the delay and its potential impact on proceedings, (3) the reason why the filing was late and whether that reason or reasons were within the filer's reasonable control, and (4) the filer's good or bad faith. ***Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship***, 507 U.S. at 395, 113 S.Ct. at 1498; ***In re SPR Corp***., 45 F.3d 70, 72 (4th Cir.1995); ***In re Nunez***, 196 B.R. 150, 157 (9th Cir.BAP 1996). These circumstances must be weighed both with and against each other because, if considered separately, they may not all point in the same direction in a particular case. ***In re Keene Corp***., 188 B.R. 903, 909 (Bankr.S.D.N.Y.1995); ***In re Nickels Performance Sys., Inc***., 169 B.R. 647, 651 (Bankr.E.D.Tenn.1994).

***Id***. at 567.

In the instant case, the deadline for identifying experts was July 1, 2003. Plaintiffs assert that they were unable to procure certain records from BMH, despite their diligent efforts to do so. These records were finally obtained on August 6, 2003 and Plaintiffs tendered the Affidavit of Dr. Gordon on August 22, 2003. No effort was made by Plaintiffs, prior to July 1, 2003, to extend the time for identification of experts, and Plaintiffs concede that it would have been wise to do so when they encountered difficulty in obtaining the records. The trial court's action must be tested by an abuse of discretion standard, and it is important to note that the trial court expressly advised the Plaintiffs that they should be careful on the agreed-on time because they would be held to it. Moreover, the trial court specifically brought to the attention of Plaintiffs' counsel the fact that there had been no proper substitution of parties after the death of the original Plaintiff. Nevertheless, the Plaintiffs failed to timely file a motion to substitute the parties.

In the instant case, the trial court found that there was no excusable neglect to justify the extension of time requested after the prior deadline had passed. Under the facts of this case, we cannot conclude that the trial court abused its discretion in requiring the Plaintiffs conform to the orders of the court.

Summary Judgment

A motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. ***See*** Tenn. R. Civ. P. 56.04. The party moving for summary judgment bears the burden of

demonstrating that no genuine issue of material fact exists. ***See Bain v. Wells***, 936 S.W.2d 618, 622 (Tenn.1997). On a motion for summary judgment, the court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. ***See id.*** In ***Byrd v. Hall***, 847 S.W.2d 208 (Tenn.1993), our Supreme Court stated:

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial. In this regard, Rule 56.05 provides that the nonmoving party cannot simply rely upon his pleadings but must set forth specific facts showing that there is a genuine issue of material fact for trial.

***Id***. at 210-11 (citations omitted) (emphasis in original).

Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion. ***See Carvell v. Bottoms***, 900 S.W.2d 23, 26 (Tenn.1995). Since only questions of law are involved, there is no presumption of correctness regarding a trial court's grant of summary judgment. ***See Bain***, 936 S.W.2d at 622. Therefore, our review of the trial court's grant of summary judgment is ***de novo*** on the record before this Court. ***See Warren v. Estate of Kirk***, 954 S.W.2d 722, 723 (Tenn. 1997).

Since the Affidavit of Dr. Gordon is not admissible because of the failure of Plaintiffs to identify the expert pursuant to the March 24, 2003 Scheduling Order, there was no dispute of the Affidavit of Dr. Wright concerning the applicable standard of care and her compliance therewith. Therefore, summary judgment was proper.

We now comment briefly on the dissenting opinion that has been filed in this case. Apparently the dissent is based upon a reading of the original Scheduling Order of January 31, 2003 as opposed to the second Scheduling Order of March 24, 2003. As noted above, the first scheduling order of January 31, 2003, was specifically set aside by the March 24, 2003 Order. The majority understands that to mean that the January 31, 2003 Order is a nullity. We have no disagreement with the law cited by the dissent, nor do we disagree that the result of denying the admission of Dr. Gordon's affidavit is harsh. However, we cannot be a result-oriented court but must adhere to the applicable law. It simply does not appear to the Court that there was any abuse of discretion shown.

Accordingly, the Order of the trial court is affirmed. Costs of the appeal are assessed to Appellants, Percy Williams and Mytina Singleton, and their surety.

                                           _____

                                           W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.